IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ANTHONY MAURICE BONE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:04CV1074 |
| | ) | |
| MARVIN L. POLK, Warden, | ) | |
| Central Prison, Raleigh, North Carolina, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a Petition for Habeas Corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Anthony Maurice Bone. This Court previously considered this matter on Respondent's Motion for Summary Judgment, and concluded that summary disposition was not appropriate and that an evidentiary hearing was warranted, particularly with respect to Petitioner's contention that he did not validly waive his Miranda rights and that his trial counsel was ineffective in failing to move to suppress his confession on that basis. Following the evidentiary hearing on the Petition, this Court allowed the parties to submit additional briefing and evidence with respect to certain issues raised during the evidentiary hearing. As further discussed below, one of the issues raised during and after the hearing involved the potential import of the decision of the Court of Appeals for the Sixth Circuit in Garner v. Mitchell, 502 F.3d 394, 408-17 (6th Cir. 2007), *vacated on rehearing en banc*, Garner v. Mitchell, 557 F.3d 257 (6th Cir. 2009) (*en banc*), dealing with the appropriate standard for determining whether an individual has knowingly and intelligently waived his Miranda rights. The United States Supreme Court has now denied certiorari in that case, and no pending issues remain. Therefore, based on the

evidence presented, and for the reasons discussed more fully below, the Habeas Petition will be DENIED.

I.      FACTUAL AND PROCEDURAL BACKGROUND

On February 5, 1999, following a jury trial in the Superior Court of Guilford County, North Carolina, Petitioner was convicted of first-degree murder and two counts of burglary. He was sentenced to death plus two consecutive terms of 146-185 months imprisonment. The North Carolina Supreme Court affirmed Petitioner's conviction and sentence on August 17, 2001, and the Supreme Court of the United States denied certiorari review on March 18, 2002. See State v. Bone, 354 N.C. 1, 550 S.E.2d 482 (2001), cert. denied, 535 U.S. 940, 122 S. Ct. 1323, 152 L. Ed. 2d 231 (2002).

On January 31, 2001, Petitioner filed a motion in state court for imposition of a life sentence on mental retardation grounds pursuant to newly-enacted N.C. Gen. Stat. § 15A-2006. Petitioner also filed a motion for appropriate relief ("MAR") on October 11, 2002 challenging his convictions. On August 6-7, 2003, the Superior Court of Guilford County conducted an evidentiary hearing on Petitioner's mental retardation claim and heard oral arguments on the MAR. Petitioner's motion for the imposition of a life sentence on mental retardation grounds was granted on January 28, 2004. Petitioner's MAR was denied without an evidentiary hearing on February 16, 2004. Petitioner filed a certiorari petition in the North Carolina Court of Appeals on April 19, 2004, which was denied on May 28, 2004.

The underlying facts of this case, as set out by the North Carolina Supreme Court in its opinion denying Petitioner's direct appeal, are as follows:

2

Defendant Anthony Maurice Bone was convicted for the first-degree murder of Ethel McCracken based upon theories of premeditation and deliberation and of felony murder. He also was convicted of two counts of first-degree burglary. . . . . At trial, the State's evidence showed that on the morning of 24 August 1997, a family friend found eighty-eight-year-old Ms. McCracken dead in her apartment at 703 Rockett Street in Greensboro, North Carolina. She was wearing a nightgown and lying face down on her bed. Her feet had been bound with curtains, and curtain material had been stuffed into her mouth. Her hands, legs, and face were bloody. Two pocketbooks found on the floor of the living room had been emptied, and a third was discovered open on the dining room table. The screen on the kitchen window had been cut.

A police dog followed a scent from Ms. McCracken's apartment to the rear of a nearby apartment building where Wesley Crompton resided. That morning, Mr. Crompton had reported a burglary after he awoke to find the screen of his bathroom window cut and the contents of his wallet scattered on his bathroom floor. Police found a flashlight, a savings account card bearing Ms. McCracken's name, and a pair of knit gloves behind Mr. Crompton's apartment.

Agents of the North Carolina State Bureau of Investigation used a dye known as "Coomassie Blue" to stain Ms. McCracken's bedroom floor. This dye allows field forensic examiners to develop latent fingerprint and shoe print impressions left in blood on a hard or reflective surface. The dye raised shoe prints that were twelve and a half inches long and four inches wide. A Greensboro Police Department crime scene technician photographed the shoe prints and removed the tiles on which the prints had been impressed. Around 26 August 1997, Detective Robin Saul of the Greensboro Police Department showed a photograph of a shoe print from Ms. McCracken's house to the manager of a sporting goods store in Greensboro and asked him to identify the type of shoe that could have made the print. The manager recognized the print pattern as having been made by a Converse shoe. Detective Saul and the manager then compared the photograph to a Converse Model 961 "Chuck Taylor" athletic shoe in the store and determined that such a "Chuck Taylor" shoe made the print on Ms. McCracken's bedroom floor. The store manager allowed Detective Saul to borrow a "Chuck Taylor" shoe.

Police began surveillance operations in high-crime areas around the victims' neighborhood. In early October 1997, the Greensboro Police Department received an anonymous tip from a caller who identified defendant as the murderer. When Detective Saul pursued this lead, he found defendant wearing a pair of "Chuck Taylor" shoes. As detailed below, Detective Saul subsequently arrested defendant and seized his shoes.

SBI Special Agent Joyce Petzka testified that the shoes seized from defendant were

consistent in sole design and size with the shoe prints found at the murder scene. The seized shoes had additional wear that was not present in the impressions taken at the scene, but Agent Petzka testified that such differences were consistent with defendant's shoes having been worn for approximately six weeks after the murder.

The forensic pathologist who performed the autopsy of Ms. McCracken testified that the primary cause of death was the fracture of her cervical spine, which most likely resulted from someone pulling her neck back. There was also some element of strangulation. In addition, Ms. McCracken suffered broken ribs, and the pathologist testified that he found blood below her right ear, in the right ear itself, and in front of the left ear.

Bone, 354 N.C. at 3-5, 550 S.E.2d at 484-485.

The evidence introduced by the State at trial included a statement made by Petitioner after he was arrested. The statement was taken by Detective Saul, who had found Petitioner wearing "Chuck Taylor" shoes. After being approached by Detective Saul, Petitioner agreed to accompany Detective Saul to the police station to be interviewed. At the police station, Detective Saul informed Petitioner that he was investigating the murder of Ms. McCracken and asked if he could examine Petitioner's shoes. Petitioner refused to give Detective Saul his shoes, so Detective Saul left the interview room and obtained a search warrant for the shoes. Detective Saul then returned to serve the search warrant on Petitioner, who surrendered the shoes, and Detective Saul took the shoes to the police laboratory to compare them to the shoe impressions from the scene. Detective Saul subsequently returned to the interview room and informed Petitioner that his shoes "matched" the shoe prints from the scene. Detective Saul read Petitioner his Miranda rights, and Petitioner signed a form acknowledging his rights, and Petitioner verbally agreed to speak with Detective Saul, but Petitioner declined to sign a waiver of his rights. Detective Saul interviewed Petitioner for an hour and a half, and Petitioner denied

4

involvement in the burglary and murder. Detective Saul then ended the interview, placed the Petitioner under arrest, and arranged for Petitioner to be taken before a magistrate so that an arrest warrant could be issued. After he was served with the arrest warrant, Petitioner told the uniformed officer he wanted to speak with Detective Saul again. Detective Saul was called back, and at Petitioner's request, Detective Saul took Petitioner back to the interview room. Detective Saul read Petitioner his <u>Miranda</u> rights for a second time. As Detective Saul read each provision on the "Acknowledgement of Rights" form, he asked Petitioner if he understood, and then checked off each provision after Petitioner verbally indicated that he understood. Petitioner signed the Acknowledgement of Rights and also signed a written Waiver of Rights, which provided that "I have read the above statement of my rights and also had my rights explained to me by a police officer. Knowing these rights, I do not want a lawyer at this time. I waive these rights knowingly and willingly and agree to answer questions and/or make a statement." Petitioner then made a statement which was written down by Detective Saul and signed by Petitioner. The statement read as follows:

> This statement is given freely and I told Det. Saul I wanted to talk to him after the warrant for murder had been read to me. On Saturday 8-23-97 sometime after dark I broke into an apartment. The reason I did this was because I had been smoking crack. I was out of money and needed some more to buy some more crack. I was in Smith Homes during this time. I was walking behind some apts on Rockett St when I noticed a window opened. I cut the screen with a pocket knife, then I crawled in through the window. This led into the kitchen. After I got in I looked around in the living room and didn't see anything. Then I saw a radio in the kitchen on the counter. I laid it on the floor. Then I walked into the bedroom and saw this white lady in bed asleep. Right when I walked in the bedroom she woke up and said what are you doing in here. I said I just want money I'm not going to hurt you. She keep saying what are you doing in here, I was afraid she was going to start yelling so I ripped the curtain off the wall and rolled her over on her stomach and tied her hands behind her back then tied her feet. I had to take the curtain rod out of the curtain before I did this. She was still trying to

5

get up and still I was afraid someone was going to hear her so I put my hands on her neck to try to hold her head down to keep her quiet and so she would not look at me. Then I tied a piece around her mouth for a gag. Then I saw her pocketbook in the bedroom. I took it along with a flashlight she had lying on her dresser into the living room. I dumped out the pocketbook on the floor and didn't find anything. While I was doing this she had been making funny noises. I went in and looked at her and she was bleeding. Then I noticed that the bedroom window could be looked through from the outside. I took a white blanket off her bed and hung up over the window so nobody could see in. When I left I unplugged the phone and left out the back door taking only her flashlight, I decided not to take the radio. After I left there I went down to another apt. The screen was already cut so I raised the window and climbed in. This was in a bathroom. When I walked around the apt I saw an old black man sleeping in a chair in the living room. On a chair was a pair of pants and inside the pants pocket was a wallet, I took this into the bedroom and dumped everything out. There was about 8 or 9 dollars and I took it and went out the window I came in through. I walked through the path to the Center and then all the way to Shamberger's Store on Eugene St. Then I bought a $5.00 rock and smoked it. Last month I told Paul Blackmon that I might have killed somebody. Paul just looked at me and didn't say anything. In closing I would like to say that I am deeply sorry and I know I've brought a lot of grief on the family but I was on drugs when this happened and I wish I didn't abuse the drugs like I do. I'm not a bad person. In time I hope you can find forgiveness. Signed Anthony Bone, R.W. Saul, 10/8/97 at 1500 hours.

Prior to trial, Petitioner's counsel filed a Motion to Suppress this statement on Fourth Amendment grounds, arguing that Petitioner's detention and arrest and the seizure of his shoes was unconstitutional, and that the confession was the result of the unlawful seizure and arrest. During argument before the trial court on the Motion to Suppress, Petitioner's counsel specifically disclaimed any Fifth Amendment challenge, and instead focused only on the Fourth Amendment argument. The trial court denied the Motion to Suppress, finding that the confession was not the result of any Fourth Amendment violation. In addition, even though no Fifth Amendment challenge had been raised, the state trial court further concluded that "Defendant was in full understanding of his constitutional right to remain silent and right to counsel, and all other rights [and] [t]he Defendant freely, knowingly, intelligently and voluntarily

6

waived each of those rights and thereupon made the statement to Detective Saul." (Order of June 8, 1999 at Conclusion of Law 8-9).[1] The confession was therefore introduced by the State at trial.

At trial, Petitioner testified on his own behalf and denied breaking into any apartment and denied killing Mrs. McCracken. Petitioner testified that during his initial interview with Detective Saul, prior to Petitioner's arrest, Detective Saul accused him of committing the offense and Petitioner denied it. Petitioner acknowledged that after he was arrested, he asked to speak with Detective Saul again. However, Petitioner testified that during that second interview, Detective Saul described how the crime happened, and Petitioner just agreed to whatever Detective Saul said.[2] Petitioner testified that he did not read the statement after it was written and that Detective Saul did not read the statement to him. Petitioner testified that he signed the statement because he was "mad and didn't care." Petitioner also testified that Detective Saul did not tell him anything about his rights, and that he signed the Acknowledgment of Rights forms because Detective Saul told him it was "for a lawyer." On cross-examination at trial, Petitioner did testify that the final sentences in the confession were his words. However, on further questioning Petitioner claimed he could not remember making some of those statements, and

---

[1] The state trial court ruled on the Motion to Suppress in open court on January 26, 1999, and subsequently entered written Findings of Fact and Conclusions of Law in an Order dated June 8, 1999.

[2] In contrast, Detective Saul testified that he did not tell Petitioner any of the details about the death of Ms. McCracken, and further that he did not tell Petitioner at all about the break-in at the nearby apartment of Mr. Crompton. Detective Saul also testified that prior to hearing Petitioner's confession, he had assumed that the perpetrator broke into Mr. Crompton's apartment first, rather than Ms. McCracken's as detailed in Petitioner's confession.

that he did not say "some of it." Petitioner subsequently testified that those were not his words and that he just signed the statement and had no idea what he was signing.

Petitioner also presented the testimony of psychologist Claudia Coleman, who had previously worked at the mental health hospital at the Federal Bureau of Prisons at Butner, North Carolina, and who was accepted by the trial court as an expert witness in clinical psychology, neuropsychology, and forensic psychology. Prior to trial, Dr. Coleman interviewed Petitioner and administered psychological and neuropsychological tests. At trial, Dr. Coleman testified that Petitioner had an IQ of 63, that this result was probably influenced by side effects from medication Petitioner was taking, and that Petitioner's IQ was probably a little higher than 63 but still in the range of borderline retardation. Dr. Coleman testified that Petitioner was in the lowest 1 percent on the reading and spelling tests, that his reading and writing skills were at the second grade level, and that with respect to the verbal portion of the IQ testing, his score within the mentally retarded range would not have been affected significantly by the medication. Dr. Coleman further testified that at the time Petitioner was interviewed by Detective Saul, Petitioner suffered from borderline retardation, undifferentiated schizophrenia, and substance dependence. However, Dr. Coleman had not been asked to assess the impact of these factors on Petitioner's statement to Detective Saul in this case, and the trial court did not allow Dr. Coleman to testify that factors such as mental illness, low intelligence, and substances abuse are variables that are associated with "false confessions" and "suggestibility" that could have affected the reliability of Petitioner's statement.

On direct appeal in state court, Petitioner alleged, *inter alia*, that the introduction of his

confession into evidence violated the Due Process Clause of the Fourteenth Amendment

because his confession was not voluntary.   See Defendant-Appellant's Brief on Appeal at p.26.

With respect to the voluntariness of Petitioner's confession, the state Supreme Court found as

follows:

> We next address whether the trial court erred in denying defendant's motion to
> suppress his confession based upon defendant's contention that it was not voluntary
> because it was induced by misstatements and a false promise made by Detective Saul.
> After Detective Saul returned from comparing defendant's shoes to the photographs
> of shoe impressions, he advised defendant of his Miranda rights, then questioned him
> for an hour and a half.   During the questioning, he told defendant that his shoes
> "matched" the tread of the shoe prints found at the murder scene and that shoe prints
> were "just like" fingerprints.   Detective Saul also told defendant he might get a lesser
> sentence if he would confess.   Defendant made no incriminating statements during this
> interrogation.   It was only after defendant was formally arrested that he asked to speak
> with Detective Saul and subsequently gave a confession.

> A confession is admissible if it "was given voluntarily and understandingly."   State v.
> Schneider, 306 N.C. 351, 355, 293 S.E.2d 157, 160 (1982).   "Whether a confession is
> voluntary is a question of law fully reviewable on appeal."   State v. Greene, 332 N.C.
> 565, 579-80, 422 S.E.2d 730, 738 (1992).   Lies or trickery used by the police "are not
> to be condoned by the courts, but standing alone, . . . they are not sufficient to render
> defendant's confession inadmissible."   State v. Jackson, 308 N.C. 549, 582, 304 S.E.2d
> 134, 152 (1983).   "The admissibility of the confession must be decided by viewing the
> totality of the circumstances, one of which may be whether the means employed were
> calculated to procure an untrue confession."   Id. at 574, 304 S.E.2d at 148.   Other
> factors to be considered are "the defendant's mental capacity; whether the defendant
> was in custody at the time the confession was made; and the presence of psychological
> coercion, physical torture, threats, or promises."   Greene, 332 N.C. at 579, 422 S.E.2d
> at 738.

> We agree with the trial court's conclusion of law that defendant's confession was
> voluntary. Detective Saul's representations that shoe prints were "just like" fingerprints
> and that defendant's shoes "matched" those impressions found at the murder scene
> were exaggerations based upon his quick comparison of the photographed print with
> the shoes recovered from defendant rather than a proper forensic examination.   The
> State's expert at trial was careful to clarify that shoe prints are not equivalent to
> fingerprints.   Nevertheless, because she also testified that the shoes prints found at the
> scene were consistent in size and design with the shoes seized from defendant,

9

Detective Saul's statements to defendant were incorrect in degree but were not outright fabrications. Although Detective Saul made no promises to defendant in exchange for a confession during this initial interview, he did tell defendant that he might receive a lesser sentence if he confessed. However, Detective Saul made no commitment, and defendant made no statement in response to this suggestion.

Only after defendant was formally arrested did he ask another officer for an opportunity to speak further with Detective Saul. At his request for something to eat, defendant was provided coffee and crackers. Detective Saul gave defendant his <u>Miranda</u> rights for a second time, and defendant signed a written waiver. Defendant was coherent and told Detective Saul that he could read. He signed and initialed his written statement. Accordingly, we hold that the trial court correctly considered the totality of circumstances and determined on the basis of competent evidence that defendant's confession was voluntary and not triggered by any improper police conduct. <u>See, e.g.</u>, <u>State v. Corley</u>, 310 N.C. 40, 47, 311 S.E.2d 540, 544 (1984) (under totality of circumstances test, statement by officer to the defendant that "'things would be a lot easier on him if he went ahead and told the truth'" did not render the defendant's statement involuntary). This assignment of error is overruled.

<u>Bone</u>, 354 N.C. at 13-14, 550 S.E.2d at 489-90.

As noted above, Petitioner subsequently filed a motion pursuant to N.C. Gen. Stat. § 15A-2005 and § 15A-2206 for imposition of life sentence based on mental retardation. That motion was granted by the Guilford County Superior Court. In the Order granting that motion, the state court made findings of fact that included the following:

The defendant Anthony Maurice Bone has an IQ of 69 or less as shown by individually administered, scientifically recognized standardized intelligence quotient tests, administered by licensed psychologists. On 14 December 2001, Dr. Olley, a licensed psychologist, individually administered a Wechsler Adult Intelligence Scale-Third Version (WAIS-III) IQ test to Mr. Bone. Mr. Bone scored below 70 on that individually administered IQ test, receiving a full-scale IQ score of 69. Mr. Bone's IQ test result indicates that he functions intellectually at the developmental level of an eleven (11) year-old. Additionally, in January 1999, Mr. Bone obtained a full scale IQ of 63 on the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III) administered by Dr. Claudia Coleman, a licensed psychologist. At trial, Dr. Coleman indicated that Mr. Bone's performance may have been affected by medication, Haldol, that he was taking at that time. After trial, during the investigative efforts in this phase of Mr. Bone's case, Dr. Coleman received and reviewed additional psychosocial background

10

information about Mr. Bone, and learned that Mr. Bone received a full scale IQ score of 69 on the test administered by Dr. Olley when Mr. Bone was not taking Haldol. As a result, Dr. Coleman opined that the defendant's performance on the January 1999 test was not grossly affected by his medication at that time. The Court credits Dr. Coleman's opinion. Similarly, the Court credits Dr. Olley's testimony that the December 2001 test corroborates that the defendant's performance on the 1999 test was not greatly affected by medication.

Thus, in this case, two individually-administered scientifically-recognized IQ tests of Mr. Bone have yielded IQ scores that satisfy the statutory criterion of "70 or below." Further, each of the licensed psychologists who has administered those tests has opined that Mr. Bone's general intellectual functioning is in the range of mental retardation. The Court finds that the defendant has sub-average general intellectual functioning as that term is used in N.C.Gen. Stat. 15A-2005(a)(1).

Mr. Bone's educational and other history shows that Mr. Bone's significantly sub average level of intellectual functioning manifested before he was eighteen (18) years old. As an elementary school student in the late 1960s, Mr. Bone's first grade teacher recognized that he did not have "the ability for regular class work" and that he should be placed in special education. Mr. Bone was placed and remained in Educable Mentally Retarded ("EMR") classes generally throughout his education. As the evidence presented explained, that Mr. Bone was placed in EMR classes means that the school system designated Anthony Bone as mentally retarded when he was a child. . . . .

The defendant has significant limitations in the Adaptive Skill area of Communication because of his difficulties in comprehending and expressing information including his inability to give directions, his need to have things explained to him repeatedly, his poor understanding of others, and his limited reading and writing skills. Dr. Olley observed that the defendant responds slowly and has difficulty understanding questions, particularly those that relate to abstract thinking. The administration of the Woodcock-Johnson Tests of Achievement, 3rd Edition (W-J III) yielded scores showing that the defendant's "oral language" and "broad reading" skills are age equivalent to that of an eight year-old. Similarly, in the administration of the Verbal Absurdities tests from the Stanford-Binet Intelligence Scale, Form L-M, Mr. Bone failed tasks at the 8, 9, and 10 year-old levels. Other evidence was presented that detailed Mr. Bone's communication skill deficiencies in practice, including but not limited to the affidavit testimony presented by the defendant's former employer (now deceased) and his wife (now deceased). These examples included the defendant's wife's descriptions of the defendant as being "hard to understand sometimes" and using words that are not appropriate for the sentence or what he is trying to say. Similarly, the defendant's former employer observed that the defendant had difficulty understanding others and that he would pretend to understand directions, but then would immediately do

11

something contrary to the instructions. . . .

The defendant has significant limitations in the Adaptive Skill area of Social Skills because of his difficulties in social exchanges with others, including that he was easily influenced by others, did not take the initiative in social relationships, and that his "friends" often exploited him. . . .

The defendant has significant limitations in the Adaptive Skill area of Self-Direction because of his difficulties related to making choices, including that he could not plan for the future, could not manage money or pay bills, and was not able to give or follow directions. The defendant never had a bank account and could not make decisions on the job that one would normally expect an employee to make. . . .

The defendant has significant limitations in the Adaptive Skill area of Functional Academics because of his limitations in cognitive abilities and skill related to learning at school that also have direct application in one's life, including the ability to read books or magazines, the ability to read a map, and the ability to fill out a job application. The administration of the Woodcock-Johnson Tests of Achievement, 3rd Edition (W-J III) in connection with the Academic Skills and Academic Fluency Clusters yielded scores that show that the defendant's skills in this Adaptive Skill Area are age-equivalent to that of a child who is under eight years old. . . . .

The Court also observes that, at the same time that Dr. Olley administered the most recent IQ test and the Woodcock Johnson test discussed above, Dr. Olley administered the Test of Memory Malingering to the defendant. The Test of Memory Malingering is designed to determine whether the person taking the tests is malingering or otherwise feigning incompetence or inaccuracy. Thus, it is designed to be an extremely easy test so that one can gauge whether the test-taker is trying to get the correct answers. In taking the test of Memory Malingering, the defendant answered 50 out of 50 questions correctly, thereby indicating that he was trying hard to answer the test questions correctly.

Order of the Guilford County, North Carolina Superior Court dated January 28, 2004.

As a result of these findings related to Petitioner's mental retardation, the state court determined that Petitioner's capital sentence should be vacated pursuant to N.C. Gen. Stat. § 15A-2005 and § 15A-2006, and his sentence was converted to a sentence of life imprisonment without the possibility of parole.

12

At the hearing regarding Petitioner's mental retardation, the Guilford County Superior Court heard oral argument regarding Petitioner's state MAR, but did not conduct any additional evidentiary hearing as to the MAR. The Guilford County Superior Court subsequently denied Petitioner's MAR. In its ruling, the MAR court noted that many of Petitioner's claims were moot because his death sentence had been converted to a sentence of life imprisonment without the possibility of parole. The MAR court also specifically addressed and rejected Petitioner's claims that he received ineffective assistance of counsel in violation of his Sixth Amendment rights with respect to his claims that: (1) his trial counsel failed to adequately investigate and present evidence that his confession was obtained in violation of his Fifth Amendment rights against self-incrimination; (2) his trial counsel failed to adequately investigate and present evidence that his confession was false and otherwise not credible; and (3) his trial counsel failed to prepare a defense strategy and otherwise prepare for trial. Petitioner then filed the present habeas petition in this Court, raising these three contentions that were considered by the MAR court, and further alleging a violation of his Fifth Amendment rights by the admission of his confession.

In support of his habeas claims, Petitioner has submitted various affidavits and evidence to support his contention that his trial counsel failed to adequately investigate and prepare for trial. Petitioner notes that he was appointed two attorneys for trial since his case was originally a capital case. Petitioner contends that his second-chair counsel, Mr. Thomas Johnson, was ineffective because he spent only 13.5 hours preparing for trial during the three weeks prior to trial and only 40 total hours during the nine months prior to trial. Petitioner contends that his

13

lead counsel, Mr. Wayne Baucino, was ineffective because Mr. Baucino did not conduct an independent investigation of the crime, contact potential witnesses, or otherwise adequately prepare for trial, since Mr. Baucino believed that the Motion to Suppress under the Fourth Amendment would be granted and the case would be dismissed. Petitioner also contends that trial counsel failed to ask Dr. Coleman to do an evaluation of Petitioner until shortly before trial, and therefore Dr. Coleman was unable to complete a full examination and was unable to test Petitioner without the side effects of his medication. Petitioner also contends that trial counsel failed to ask Dr. Coleman to determine the effects of Petitioner's mental condition on his suggestibility and the potential falsity of his confession. Finally, Petitioner contends that trial counsel should have investigated his mental impairments sooner with regard to his ability to waive his <u>Miranda</u> rights, so that counsel could have fully considered and raised a <u>Miranda</u> challenge as part of the Motion to Suppress, rather than just the Fourth Amendment challenge. Petitioner contends that subsequent testing has revealed that Petitioner did not understand his <u>Miranda</u> rights and did not knowingly and understandingly waive those rights, that Petitioner did not have the ability to read or understand the confession because it was written above his reading level, and that Petitioner was suggestible and easily coerced.

Petitioner has submitted an affidavit from Mr. Baucino in which Mr. Baucino notes that he did not conduct a separate investigation or talk to witnesses, did not ask Dr. Coleman to perform any tests or evaluations of Petitioner until close to trial, did not ask Dr. Coleman to determine whether Petitioner was susceptible to giving a false confession, and did not obtain evidence regarding whether Petitioner could read and understand the <u>Miranda</u> rights form or the

14

confession. Mr. Baucio further notes that he did not consider moving to suppress the confession on the grounds that Petitioner did not voluntarily and knowingly waive his <u>Miranda</u> rights, because he had not obtained any testing from Dr. Coleman to evaluate this option, and because he was confident the motion to suppress would be successful on Fourth Amendment grounds and did not believe that there would be a trial. In the affidavit, Mr. Baucino states that the failure to pursue a Fifth Amendment challenge was not the product of a strategic or tactical decision. Petitioner has also submitted an affidavit from Mr. Johnson, in which Mr. Johnson notes that he was second-chair counsel, was not involved in investigation of the guilt/innocence phase of the trial, was not involved in contacting Dr. Coleman, was not involved in preparing or presenting the motion to suppress the confession, and spent 13.5 hours on pre-trial preparation during the three weeks before trial.

Because the state MAR court did not conduct an evidentiary hearing on these issues, and in light of the issues raised by Petitioner and the state court determination that Petitioner was and is mentally retarded, this Court conducted an evidentiary hearing with respect to Petitioner's claims, and allowed the parties to submit briefs related to issues raised during the evidentiary hearing. The Court has therefore considered the habeas petition in light of the full record that has been presented, including the evidence presented during the hearing before this Court.

II.    STANDARD OF REVIEW

In reviewing a habeas petition pursuant to 28 U.S.C. § 2254, if a claim has been adjudicated on the merits by the state courts, the habeas petition may only be granted if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable

15

application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established Supreme Court precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court or if it arrives at a different result from the Supreme Court on a set of materially indistinguishable facts. See Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 1519-1520, 146 L. Ed. 2d 389 (2000). A state court decision involves an "unreasonable application" of clearly established federal law if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. See Williams v. Taylor, 529 U.S. at 407, 120 S. Ct. at 1520. Under this deferential standard, the state court's application of clearly established federal law must be "objectively unreasonable" and "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Williams v. Taylor, 529 U.S. at 411, 120 S. Ct. at 1522.

In considering whether a state court determination was contrary to or an unreasonable application of "clearly established federal law," the Supreme Court has considered the wide divergence of treatment among the lower federal courts on an issue as "[r]eflecting the lack of guidance" from the Supreme Court. See, e.g., Carey v. Musladin, 549 U.S. 70, 76-77, 127 S. Ct. 649, 654, 166 L. Ed. 2d 482 (2006); see also Wright v. Van Patten, 552 U.S. 120, 126, 128 S. Ct.

Case 1:04-cv-01074-JAB-WWD   Document 36   Filed 07/09/10   Page 16 of 60

743, 747, 169 L. Ed. 2d 583 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." (internal quotation omitted)). Thus, divergent opinions in the lower court on an issue may reflect a lack of clear guidance by the Supreme Court, and can be considered in determining whether a state court determination is contrary to or an unreasonable application of "clearly established federal law." See also Knowles v. Mirzayance, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251 (2009) (noting that "[i]t is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established" by the Supreme Court); Renico v. Lett, 130 S. Ct. 1855, 1864, 176 L. Ed. 2d 678 (2010) ("Because AEDPA authorizes federal courts to grant relief only when state courts act unreasonably, it follows that the more general the rule at issue – and thus the greater the potential for reasoned disagreement among fair-minded judges – the more leeway state courts have in reaching outcomes in case-by-case determinations." (internal quotations omitted)).

"Moreover, when 'assessing the reasonableness of the state court's application of federal law, the federal courts are to review the result that the state court reached, not whether [its decision] [was] well reasoned." Larry v. Branker, 552 F.3d 356 (4th Cir. 2009) (quoting Wilson v. Ozmint, 352 F.3d 847, 855 (4th Cir. 2003) (alteration in original)); see also Bell v. Jarvis, 236 F.3d 149, 163 (4th Cir. 2000) (noting that where a state court fails to articulate the rationale behind its ruling, federal habeas review is still deferential "because we cannot grant relief unless

17

the state court's *result* is legally or factually unreasonable" (emphasis in original)).[3]

For habeas claims alleging ineffective assistance of counsel under Strickland v. Washington, the Petitioner must establish that: (1) counsel's performance was deficient, falling below an objective standard of reasonableness based on prevailing professional norms (with errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment); and (2) the deficient performance prejudiced the defense because there is a reasonable probability that but for counsel's unprofessional errors, the result would have been different. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068. The reviewing Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" with a "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Where the state courts have already considered a claim of ineffective assistance of counsel, this Court on habeas review considers whether the state court application of Strickland was contrary to or an

───────────────

[3] In light of the Fourth Circuit standard set out above, this Court will consider all of Petitioner's habeas claims under the deferential AEDPA standard. However, the Court notes that the Supreme Court has granted certiorari on the question: "Does AEDPA deference apply to a state court's summary disposition of a claim, including a claim under Strickland v. Washington, 466 U.S. 668 (1984)?" Harrington v. Richter, 130 S. Ct. 1506, 176 L. Ed. 2d 108 (2010); see also Smith v. Spisak, 130 S. Ct. 676, 688, 175 L. Ed. 2d 595 (2010) (declining to reach the question of whether deferential review applies to a state court's summary rejection of an ineffective assistance of counsel claim). Therefore, to the extent that the state MAR court in the present case did not include reasoning or fact-finding to support some portions of its ultimate conclusion, the Court has also considered those matters *de novo*, as discussed below.

unreasonable application of federal law.  See Knowles v. Mirzayance, 129 S. Ct. 1411, 1419-20,

173 L. Ed. 2d 251 (2009) (noting that habeas claims alleging ineffective assistance of counsel

"may be granted only if the state-court decision unreasonably applied the more general standard

for ineffective-assistance-of-counsel claims established by Strickland . . . . [a]nd, because the

Strickland standard is a general standard, a state court has even more latitude to reasonably

determine that a defendant has not satisfied that standard.").

III.    APPLICATION TO PETITIONER'S CLAIMS

        Petitioner's Habeas Petition raises four grounds for relief: (1) ineffective assistance of

counsel in violation of his Sixth Amendment rights based on Petitioner's contention that trial

counsel failed to adequately investigate and present evidence that his confession was obtained

in violation of his Fifth Amendment rights against self-incrimination; (2) ineffective assistance

of counsel in violation of his Sixth Amendment rights based on Petitioner's contention that his

trial counsel failed to adequately investigate and present evidence that his confession was false

and otherwise not credible; (3) ineffective assistance of counsel in violation of his Sixth

Amendment rights based on Petitioner's contention that his trial counsel failed to prepare a

defense strategy and otherwise prepare for trial; and (4) violation of his Fifth Amendment rights

by the admission of his confession at trial.   Thus, Petitioner's first and fourth claims relate to

his contention that his confession was obtained in violation of his Fifth Amendment rights,

while his second and third claims relate to separate contentions that his trial attorneys were

ineffective for failing to take certain action.   In analyzing these contentions, the Court will first

consider together claims one and four (Part A), and will then separately consider claim two (Part

B) and claim three (Part C). As noted above, as to each of these contentions, where the state courts have already addressed these issues, this Court considers only whether the state court determination was either contrary to or an unreasonable application of clearly established federal law.

    A.    Claims One and Four Related to Alleged Violation of Petitioner's Fifth Amendment Rights

Petitioner's primary contention in his Habeas Petition, as set out in his first and fourth claims, is that his Fifth Amendment rights were violated by the admission of his confession during his trial, because he lacked the mental capacity to knowingly and intelligently waive his <u>Miranda</u> rights. To the extent that his trial counsel failed to object to admission of the confession on these grounds and failed to develop evidence to support this contention, Petitioner contends that this failure constituted ineffective assistance of counsel. Petitioner's contentions in this regard rely on his argument that in light of his mental retardation, his <u>Miranda</u> rights were not properly waived, and his confession was therefore inadmissible. Petitioner raised these contentions with the state MAR court, and Petitioner contends that the MAR court's rejection of his claims was contrary to and an unreasonable application of clearly established federal law.

The Fifth Amendment protects individuals from compelled self-incrimination, and in <u>Miranda v. Arizona</u>, the Supreme Court "saw as inherently coercive any police custodial interrogation conducted by isolating the suspect with police officers; therefore, the Court established a *per se* rule that all incriminating statements made during such interrogation are barred as compelled." <u>United States v. Washington</u>, 431 U.S. 181, 187, 97 S. Ct. 1814, 1819, 52

B) and claim three (Part C). As noted above, as to each of these contentions, where the state courts have already addressed these issues, this Court considers only whether the state court determination was either contrary to or an unreasonable application of clearly established federal law.

    A.    Claims One and Four Related to Alleged Violation of Petitioner's Fifth Amendment Rights

Petitioner's primary contention in his Habeas Petition, as set out in his first and fourth claims, is that his Fifth Amendment rights were violated by the admission of his confession during his trial, because he lacked the mental capacity to knowingly and intelligently waive his <u>Miranda</u> rights. To the extent that his trial counsel failed to object to admission of the confession on these grounds and failed to develop evidence to support this contention, Petitioner contends that this failure constituted ineffective assistance of counsel. Petitioner's contentions in this regard rely on his argument that in light of his mental retardation, his <u>Miranda</u> rights were not properly waived, and his confession was therefore inadmissible. Petitioner raised these contentions with the state MAR court, and Petitioner contends that the MAR court's rejection of his claims was contrary to and an unreasonable application of clearly established federal law.

The Fifth Amendment protects individuals from compelled self-incrimination, and in <u>Miranda v. Arizona</u>, the Supreme Court "saw as inherently coercive any police custodial interrogation conducted by isolating the suspect with police officers; therefore, the Court established a *per se* rule that all incriminating statements made during such interrogation are barred as compelled." <u>United States v. Washington</u>, 431 U.S. 181, 187, 97 S. Ct. 1814, 1819, 52

B) and claim three (Part C). As noted above, as to each of these contentions, where the state courts have already addressed these issues, this Court considers only whether the state court determination was either contrary to or an unreasonable application of clearly established federal law.

    A.    Claims One and Four Related to Alleged Violation of Petitioner's Fifth Amendment Rights

Petitioner's primary contention in his Habeas Petition, as set out in his first and fourth claims, is that his Fifth Amendment rights were violated by the admission of his confession during his trial, because he lacked the mental capacity to knowingly and intelligently waive his <u>Miranda</u> rights. To the extent that his trial counsel failed to object to admission of the confession on these grounds and failed to develop evidence to support this contention, Petitioner contends that this failure constituted ineffective assistance of counsel. Petitioner's contentions in this regard rely on his argument that in light of his mental retardation, his <u>Miranda</u> rights were not properly waived, and his confession was therefore inadmissible. Petitioner raised these contentions with the state MAR court, and Petitioner contends that the MAR court's rejection of his claims was contrary to and an unreasonable application of clearly established federal law.

The Fifth Amendment protects individuals from compelled self-incrimination, and in <u>Miranda v. Arizona</u>, the Supreme Court "saw as inherently coercive any police custodial interrogation conducted by isolating the suspect with police officers; therefore, the Court established a *per se* rule that all incriminating statements made during such interrogation are barred as compelled." <u>United States v. Washington</u>, 431 U.S. 181, 187, 97 S. Ct. 1814, 1819, 52

20

L. Ed. 2d 238 (1977) (discussing Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). Therefore "if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." Miranda, 384 U.S. at 467-68, 86 S. Ct. at 1624. In addition, "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." Miranda, 384 U.S. at 471, 86 S. Ct. at 1626; see also Florida v. Powell, 130 S. Ct. 1195, 1204, 175 L. Ed. 2d 1009 (2010) (holding that no specific wording is required, and "[t]he inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by Miranda" (internal quotations omitted)). If the suspect makes a statement after the required warnings are given, the Government must "demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 475, 86 S. Ct. at 1628; see also Berghuis v. Thompkins, 130 S. Ct. 2250, 2260 (2010) ("Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived Miranda rights when making the statement." (internal quotation omitted)). Thus, "[a] statement is not 'compelled' within the meaning of the Fifth Amendment if an individual 'voluntarily, knowingly and intelligently' waives his constitutional privilege.'" Colorado v. Spring, 479 U.S. 564, 573, 107 S. Ct. 851, 857, 93 L. Ed. 2d 954 (1987) (quoting Miranda, 384 U.S. at 444, 86 S. Ct. at 1612).

   A valid waiver of Miranda rights involves two components: (1) the waiver must have

been voluntary, and not the result of any coercion by law enforcement officers; and (2) the waiver must have been knowingly and intelligently made. See Colorado v. Spring, 479 U.S. at 573, 107 S. Ct. at 857; see also Berghuis v. Thompkins, 130 S. Ct. at 2260. In defining these components, the Supreme Court has stated that: "First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Colorado v. Spring, 479 U.S. at 573, 107 S. Ct. at 857 (quoting Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986)).

In Colorado v. Connelly, the Supreme Court considered the first prong of this test, "voluntariness," and held that a defendant must establish the existence of coercive police conduct in order to show that a waiver of Miranda rights was "involuntary" and therefore subject to the exclusionary rule. See Colorado v. Connelly, 479 U.S. 157, 163-67, 107 S. Ct. 515, 519-22, 93 L. Ed. 2d 473 (1986). The analysis for determining whether a waiver of Miranda rights is "voluntary" is the same as the analysis under the Due Process Clause of the Fourteenth Amendment for determining whether the confession itself is voluntary and not the result of coercion. See Colorado v. Connelly, 479 U.S. at 169-70, 107 S. Ct. at 522-23 (noting that "[t]here is obviously no reason to require more in the way of a 'voluntariness' inquiry in the

22

<u>Miranda</u> waiver context than in the Fourteenth Amendment confession context"); <u>Dickerson</u> <u>v. United States</u>, 530 U.S. 428, 433-34, 120 S. Ct. 2326, 2330-31, 147 L. Ed. 2d 405 (2000) (noting that there are historically "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment").   In considering the question of "voluntariness" under the Due Process Clause, courts consider "'whether a defendant's will was overborne' . . . tak[ing] into consideration 'the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation.'" <u>Dickerson</u>, 530 U.S. at 434, 120 S. Ct. at 2331 (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 223, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)).   However, the Supreme Court has further held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." <u>Colorado v. Connelly</u>, 479 U.S. at 167, 107 S. Ct. at 522.   "We engage in the same inquiry when analyzing the voluntariness of a <u>Miranda</u> waiver as when analyzing the voluntariness of statements under the Due Process Clause." <u>United States v. Cristobal</u>, 293 F.3d 134, 140 (4th Cir. 2002).   Thus, if a suspect's waiver of his <u>Miranda</u> rights is a result of police coercion that caused his will to be "overborne," the waiver is not considered voluntary, and any statement or confession obtained violates <u>Miranda</u> and is inadmissible.

   In <u>Colorado v. Connelly</u>, the Supreme Court did not address the second prong of the <u>Miranda</u> waiver requirement, that is, whether the <u>Miranda</u> waiver was "knowing and intelligent." However, in the subsequent case of <u>Colorado v. Spring</u>, the Supreme Court reiterated the two-

23

prong inquiry for determining a waiver of <u>Miranda</u> rights. <u>Colorado v. Spring</u>, 479 U.S. at 574,

107 S. Ct. at 857-58. Thus, as noted above, a valid waiver of <u>Miranda</u> rights involves a second,

separate inquiry: not only must the waiver be voluntary and uncoerced, the waiver must also be

knowingly and intelligently made. In determining whether a waiver of <u>Miranda</u> rights is

knowingly and intelligently made, the Supreme Court has held that: "[t]he Constitution does not

require that a criminal suspect know and understand every possible consequence of a waiver of

the Fifth Amendment privilege. . . . The Fifth Amendment's guarantee is both simpler and more

fundamental: A defendant may not be compelled to be a witness against himself in any respect.

The <u>Miranda</u> warnings protect this privilege by ensuring that a suspect knows that he may

choose not to talk to law enforcement officers, to talk only with counsel present, or to

discontinue talking at any time. The <u>Miranda</u> warnings ensure that a waiver of these rights is

knowing and intelligent by requiring that the suspect be fully advised of this constitutional

privilege, including the critical advice that whatever he chooses to say may be used as evidence

against him." <u>Colorado v. Spring</u>, 479 U.S. at 574, 107 S. Ct. at 857-58 (citing <u>Moran v. Burbine</u>,

475 U.S. at 422, 106 S. Ct. at 1141); <u>see also</u> <u>Berghuis v. Thompkins</u>, 130 S. Ct. at 2261 (2010)

(noting that if a <u>Miranda</u> warning is given and the accused makes as uncoerced statement, "[t]he

prosecution must make the additional showing that the accused understood these rights" in

order to establish a valid waiver of <u>Miranda</u> rights). The determination of whether a waiver is

knowing and intelligent is "made upon an inquiry into the totality of the circumstances

surrounding the interrogation," including the suspect's "age, experience, education, background,

and intelligence" as well as "capacity to understand the warnings given him, the nature of his

24

Fifth Amendment rights, and the consequences of waiving those rights." <u>Fare v. Michael C.</u>, 442 U.S. 707, 725, 99 S. Ct. 2560, 2572, 61 L. Ed. 2d 197 (1979).

Thus, in the present case, Petitioner's challenge to his confession as raised in Claims One and Four involves a two-prong inquiry: (1) was Petitioner's waiver of his <u>Miranda</u> rights voluntary; and (2) was Petitioner's waiver of his <u>Miranda</u> rights knowing and intelligent. In the proceedings before the state MAR court, Petitioner raised these same contentions, alleging that introduction of his confession violated his Fifth Amendment rights because he had not properly waived his <u>Miranda</u> rights, and that his trial counsel was ineffective in failing to investigate and raise a <u>Miranda</u> challenge. In addressing these contentions regarding Petitioner's waiver of <u>Miranda</u> rights, the MAR court found that:

4.  The sole concern of the Fifth Amendment, upon which <u>Miranda</u> was based, is governmental coercion. <u>United States v. Washington</u>, 431 U.S. 181, 97 S. Ct. 1814, 52 L. Ed. 2d 238 (1977). The voluntariness of the waiver of the Fifth Amendment privilege 'has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word.' <u>Colorado v. Connelly</u>, 479 U.S. 157, 170, 107 S. Ct. 515, 523, 93 L. Ed. 2d 473, 486 (1986). Although in a Fifth Amendment challenge, '[a] defendant's subnormal capacity is a factor to be considered when determining whether a knowing and intelligent waiver of rights has been made [, . . . s]uch lack of intelligence does not, however, standing alone, render an in-custody statement incompetent if it is in all other respects voluntarily and understandingly made.' <u>State v. Jones</u>, 153 N.C. App. 358, 570 S.E.2d 128 (2002). <u>See</u> <u>State v. Jenkins</u>, 300 N.C. 578, 268 S.E.2d 458 (1980) (mildly retarded defendant with IQ of 60 capable of waiving rights under <u>Miranda</u>); <u>State v. Thompson</u>, 287 N.C. 303, 214 S.E.2d 742 (1975) (nineteen-year-old defendant with IQ of 55 capable of waiving rights).

5.  The Court notes that although Defendant did not raise a Fifth Amendment issue regarding his confession on direct appeal, the North Carolina Supreme Court nevertheless inter alia analyzed the claim on that ground, concluding that defendant's confession was voluntary and not triggered by any improper police conduct. <u>Bone</u>, 354 N.C. at 13-14, 550 S.E.2d at 490. Whether or not the North Carolina Supreme Court had evidence on voluntariness before it, or whether

defendant had the mental capacity to understand the <u>Miranda</u> rights given does not diminish this Court's reliance on the discussion of this issue by the North Carolina Supreme Court.

6.      This claim is accordingly subject to procedural bar pursuant to N.C.G.S. 15A-1419(a)(2) unless defendant can demonstrate the necessary good cause and actual prejudice or a fundamental miscarriage of justice to overcome the bar.

7.      The Court finds that defendant's alleged mental disabilities would not have successfully supported a Fifth Amendment challenge to defendant's confession because there is no evidence, either in the motion transcript or in the trial transcript, of any police misconduct. <u>Colorado v. Connelly</u>, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473; <u>Bone</u>, <u>id.</u>

8.      The Court further finds that defendant has failed to demonstrate ineffective assistance of trial counsel pursuant to <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh'g denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984), and <u>State v. Braswell</u>, 312 N.C. 553, 324 S.E.2d 241 (1985).

(MAR Court Order dated February 23, 2004 at 6 - 7.)

The MAR court thus concluded that Petitioner's <u>Miranda</u> challenge would have been unsuccessful because there was no evidence of police misconduct or coercion to support a Fifth Amendment challenge. Petitioner contends that this determination was contrary to or an unreasonable application of clearly established federal law. In evaluating this contention, the Court will consider separately the two prongs involved in a waiver of <u>Miranda</u> rights: (a) was the waiver of <u>Miranda</u> rights voluntary; and (b) was the waiver of his <u>Miranda</u> rights knowing and intelligent.

     1.      First Prong: Voluntariness

As noted above, in considering a waiver of <u>Miranda</u> rights, the first prong of the analysis requires a determination of whether the waiver was "voluntary." The determination of the "voluntariness" of a <u>Miranda</u> waiver is similar to the determination of "voluntariness" of a

confession under the Due Process Clause.  See <u>Colorado v. Connelly</u>, 479 U.S. at 169-70, 107

S. Ct. at 522-23 (noting that there is "no reason to require more in the way of a 'voluntariness'

inquiry in the <u>Miranda</u> waiver context than in the Fourteenth Amendment confession context"

and that the sole concern in determining voluntariness of a <u>Miranda</u> waiver is "governmental

coercion" and "police overreaching").  In the present case, the state supreme court found that

Petitioner's confession itself was voluntary, was not triggered by any improper police conduct,

and did not violate Due Process. Based on this determination by the state supreme court, the

MAR court concluded that Petitioner's waiver of his <u>Miranda</u> rights was likewise voluntary and

uncoerced.[4]   The MAR court further rejected Petitioner's contentions that his trial counsel was

ineffective for failing to investigate and present additional evidence regarding Petitioner's mental

---

[4] The MAR court concluded that the state supreme court had analyzed the Fifth Amendment issue on direct appeal.  However, as discussed above, the Fifth Amendment issue was not raised or addressed on direct appeal.  Instead, the issue raised on direct appeal was whether Petitioner's confession violated the Due Process Clause.  As discussed above, the determination of whether Petitioner's confession violated the Due Process Clause involves only one consideration: whether the confession itself was voluntary and not the result of police coercion.  In the present case, in considering this Due Process issue on direct appeal, the state supreme court concluded that Detective Saul's conduct was not coercive and did not render Petitioner's confession involuntary under the Due Process Clause.  See <u>State v. Bone</u>, 354 N.C. at 13-14, 550 S.E.2d at 489-90.  Petitioner did not raise a Due Process challenge before the MAR court or in his Habeas Petition before this Court.   However, even if a Due Process challenge had been properly exhausted before the MAR court and raised before this Court, this Court finds no basis to conclude that Petitioner's confession was involuntary in violation of the Due Process clause.  To the extent Petitioner has now presented additional evidence regarding his mental impairments, this Court has considered all of the evidence, including the additional evidence proffered by Petitioner, and concludes that given the totality of the circumstances, there is still no evidence of police misconduct or coercion to support the conclusion that Petitioner's confession violated the Due Process Clause.  To the extent that this Due Process inquiry overlaps with the <u>Miranda</u> waiver inquiry, that issue is discussed as part of the analysis in Section 1 above.

27

impairments that Petitioner contends would have changed the determination of whether his waiver of Miranda rights was "voluntary" and uncoerced. In rejecting this contention, the MAR court concluded that Petitioner's "alleged mental disabilities would not have successfully supported a Fifth Amendment challenge to defendant's confession because there is no evidence . . . of any police misconduct."

At the evidentiary hearing before this Court, Petitioner did not attempt to establish that the waiver of his Miranda rights was coerced or involuntary in violation of the first prong of this test, and instead focused on the second prong of the test discussed below. However, in his briefing, Petitioner has raised the general contention that the determination by the MAR court, as it relates to the question of "voluntariness" of the Miranda waiver, is contrary to and an unreasonable application of clearly established federal law, based on Petitioner's contentions that the MAR court unreasonably relied on the state supreme court's determination and failed to undertake a consideration of the "totality of the circumstances" in light of the additional evidence proffered by Petitioner. Therefore, this Court has undertaken a consideration of Petitioner's general contentions with respect to the first prong of the Miranda waiver determination.

However, having considered Petitioner's contentions, this Court finds that the conclusion of the MAR court as it relates to the question of "voluntariness" of the Miranda waiver is not contrary to or an unreasonable application of federal law, nor is it an unreasonable determination of the facts. In this regard, the Court notes that the state supreme court on direct appeal concluded that Detective Saul's conduct was not coercive and that there was no improper police

28

conduct that would render Petitioner's confession involuntary under the Due Process Clause. Based on the findings by the state supreme court, the MAR court found no coercion or police misconduct that would render Petitioner's waiver of his <u>Miranda</u> rights involuntary or coerced. As discussed above, although the Due Process inquiry and Fifth Amendment "voluntariness" inquiry are not identical, the analysis is the same. Therefore, the state supreme court's finding that there was no "improper police conduct" and that the confession itself was voluntary under the Due Process Clause is certainly relevant to the determination of "voluntariness" of the <u>Miranda</u> waiver, and it was therefore reasonable for the MAR court to consider and rely on the state supreme court's findings. In addition, although the state trial court and state supreme court did not have available all of the information now assembled regarding Petitioner's mental disabilities, the state trial court and state supreme court did have before it evidence from Dr. Coleman indicating that Petitioner was at least borderline mentally retarded and suffered from schizophrenia and substance abuse. On habeas review, the MAR court had before it Petitioner's additional evidence and allegations regarding his mental disabilities, but the MAR court nevertheless concluded that there was still no evidence of police misconduct to support Petitioner's <u>Miranda</u> challenge. This Court concludes that this determination by the MAR court is not contrary to or an unreasonable application of clearly established federal law with respect to the "voluntariness" of the <u>Miranda</u> waiver.

Moreover, with respect to Petitioner's contention that deferential review is not appropriate because the MAR court unreasonably failed to consider the "totality of the circumstances" in light of the additional information presented regarding Petitioner's mental

disabilities, this Court concludes that the result would still be the same even if this Court conducted *de novo* review of this issue. In this regard, this Court has considered the totality of the circumstances, including the record before the state court, the additional evidence Petitioner has presented regarding Petitioner's mental disabilities, including the affidavits and testimony presented during the evidentiary hearing before this Court, and the testimony of Detective Saul during the evidentiary hearing before this Court. Based on this review, this Court concludes that there is no evidence of coercive police conduct that would have caused Petitioner's will to be "overborne" and would have rendered Petitioner's waiver of his <u>Miranda</u> rights involuntary. In reaching this determination, this Court agrees with the finding of the state supreme court that Detective Saul's statements regarding the shoe print "match" were "incorrect in degree but were not outright fabrications." In addition, this Court agrees with the findings of the state supreme court that Detective Saul made no commitment that Petitioner would receive a lesser sentence if he confessed, and that Petitioner did not make a statement in response to Detective Saul's suggestions. Indeed, Detective Saul had ceased interviewing Petitioner, and Petitioner himself requested the second opportunity to speak with Detective Saul. Petitioner was given his <u>Miranda</u> rights for a second time before he signed the written waiver of his <u>Miranda</u> rights. In addition, the testimony by Detective Saul before this Court describing the events at the specific time and date of Petitioner's interrogation, arrest, and subsequent confession, was credible and further established a lack of misconduct and a lack of coerciveness on the part of Detective Saul. In considering the evidence presented, this Court finds that the additional psychological evidence regarding Petitioner's mental retardation does not change the ultimate conclusion that,

in the totality of the circumstances, Petitioner's waiver of his <u>Miranda</u> rights was voluntary and not the result of coercion. Thus, even if Petitioner's trial counsel had undertaken a full investigation of Petitioner's mental disabilities and pursued a <u>Miranda</u> challenge, there is no reasonable probability that the trial court would have concluded that Petitioner's will was overborne and the waiver of his <u>Miranda</u> rights was not voluntary. Therefore, Petitioner cannot establish that he was prejudiced by trial counsel's alleged failure to investigate and challenge the "voluntariness" of his <u>Miranda</u> waiver.

    2.  Second Prong: Knowing and Intelligent

   Thus, the Court is left with Petitioner's contentions with respect to the second prong of the <u>Miranda</u> analysis, that is, the contention that Petitioner's waiver of his <u>Miranda</u> rights was not knowingly and intelligently made due to his mental retardation, and that his trial attorneys were ineffective in failing to sufficiently investigate and present this issue in order to suppress the confession at trial. As noted above, this issue was not raised before the state supreme court, and the state supreme court considered only the Due Process inquiry, which involves only the question of voluntariness. The <u>Miranda</u> issue was raised before the MAR court, and as discussed above, the MAR court reviewed this contention but focused on the lack of police misconduct, and by choice or oversight, the MAR court did not make factual findings or further determination with respect to whether the waiver of <u>Miranda</u> rights was knowingly and intelligently made. Because this prong had not been addressed by the state supreme court or by the MAR court, and further because, as this Court noted to counsel for the State and Petitioner, Petitioner squarely raised a substantial question regarding whether he could knowingly and

intelligently waive his rights in light of the state court's unrefuted determination that he was mentally retarded, this Court conducted an evidentiary hearing on this issue.[5]

Although the Supreme Court has articulated a general rule for determining whether a <u>Miranda</u> waiver is "knowing and intelligent," the lower courts have taken varied approaches in applying this test in particular cases. One of the most recent such cases, which illustrates these varied approaches and which is strikingly similar to the present case, is the *en banc* decision of the Court of Appeals for the Sixth Circuit in <u>Garner v. Mitchell</u>, 557 F.3d 257 (6th Cir. 2009). In <u>Garner</u>, the defendant confessed to burglarizing and setting fire to an apartment, killing five children who he knew were sleeping inside. His confession came after he had been advised of his <u>Miranda</u> rights, and the confession was admitted at trial and the defendant was convicted. The defendant in that case subsequently brought a habeas petition contending, among other things, that he did not knowingly and intelligently waive his <u>Miranda</u> rights. In support of this contention, the defendant in <u>Garner</u> presented expert testimony to establish that due to his mental impairments, he could not have understood his <u>Miranda</u> rights. In a 2007 panel decision, the Sixth Circuit panel concluded that based on the 'totality of the circumstances,' Garner did not knowingly and intelligently waive his rights. <u>See</u> <u>Garner v. Mitchell</u>, 502 F.3d 394, 408-417 (6th Cir. 2007), *vacated on rehearing en banc*. In particular, the 2007 panel noted that Garner had an IQ at the time of the offense of 76, had dropped out of school after the 7th grade, and had

_____

[5] In setting the evidentiary hearing, the Court noted that Petitioner could present evidence with respect to any of his habeas claims, but the focus of the Court's and the parties' attention was Petitioner's contention that his waiver of his <u>Miranda</u> rights was not knowing and intelligent.

presented un-rebutted expert opinion and testing to establish that he did not have a full comprehension of the Miranda warnings or the right to remain silent. The 2007 panel acknowledged that Garner appeared to be of average intelligence by observation, that he told police officers he understood the warnings as they were read, that he told police officers that he could read and had completed the 12th grade, and that officers had read the warnings twice and had no reason to know that Garner could not understand the warnings. However, the 2007 panel rejected the suggestion that the determination should depend on the perception of the police. In light of this Sixth Circuit panel decision, which was analogous to and supportive of Petitioner's contentions in the present case, this Court allowed Petitioner, despite the strong opposite contention by the state, to continue with his habeas petition in this Court and allowed Petitioner to present evidence that he had attempted, but been unable to present to the MAR court. However, it is significant that after the evidentiary hearing in the present case, the Sixth Circuit subsequently issued an *en banc* decision contrary to the 2007 panel decision. In the 2009 *en banc* decision, eight judges joined an opinion concluding that the habeas petition should be denied, notwithstanding the expert testimony that Garner could not have understood the Miranda warnings, because according to the *en banc* court, the proper inquiry focuses on the suspect's conduct at the time of the interrogation and whether the police officers had any indication that the suspect's "age, experience, education, background, and intelligence" may have prevented him from understanding the Miranda warnings. Under the *en banc* opinion, "even if Garner's mental capacity, background, age, and experience did somehow prevent him from actually understanding the Miranda warnings . . . the officers questioning Garner had no way to

33

discern the misunderstanding in Garner's mind [and] [t]his is of primary significance given the original purpose underlying the <u>Miranda</u> decision, which was to 'reduce the likelihood that the suspects would fall victim to constitutionally impermissible practices of police interrogation.'" <u>Garner</u>, 557 F.3d at 262 (quoting <u>New York v. Quarles</u>, 467 U.S. 649, 656, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984)). The *en banc* Sixth Circuit noted that the later production of evidence of the defendant's inability to understand the warnings could indeed be considered, but only to determine whether "the police should have known that the defendant could not understand." <u>Garner</u>, 557 F.3d at 263. The *en banc* Sixth Circuit also noted that the Seventh Circuit had adopted a similar rule, which held that "[t]he knowledge of the police is vital. . . [and] the question is not whether if [the defendant] were more intelligent, informed, balanced, and so forth he would not have waived his <u>Miranda</u> rights, but whether the police believed he understood their explanation of those rights; more precisely, whether a reasonable state court judge could have found that the police believed this." <u>Garner</u>, 557 F.3d at 262 (quoting <u>Rice v. Cooper</u>, 148 F.3d 747, 750-51 (7th Cir. 1998) (Posner, Chief Judge)); <u>see also</u> <u>United States v. Al-Cholan</u>, 2010 WL 2130612 (6th Cir. May 27, 2010) (applying <u>Garner</u> in a case where the defendant later alleged that he could not sufficiently understand <u>Miranda</u> warnings given in English, and concluding that "whether or not Al-Cholan truly understood the <u>Miranda</u> warnings, the agents certainly had no contemporaneous reason to doubt that he did. Our inquiry necessarily ends there"). However, in the *en banc* Sixth Circuit case in <u>Garner</u>, five judges filed or joined separate opinions which reflected a wide split of opinion on the proper application of the "knowing and intelligent" waiver requirement, and in particular whether it is appropriate to

focus on the conduct of police officers and whether the officers had reason to know that the defendant lacked the ability to understand Miranda warnings, or whether the proper focus is instead whether, as a subjective matter, the defendant understood the Miranda warnings and intelligently waived those warnings.[6]    The Court of Appeals for the Fourth Circuit has not explicitly addressed this distinction, but has held that courts should consider the totality of the circumstances to determine whether the individual understood that he had the right to remain silent and that anything he said could be used as evidence against him. See Cristobal, 293 F.3d at 142. In United States v. Robinson, the Fourth Circuit applied this test in the case of an individual, defendant Robinson, who claimed that his Miranda waiver was not knowing and intelligent due to his limited mental ability. United States v. Robinson, 404 F.3d 850, 860-61 (4th Cir. 2005). In analyzing that contention, the Fourth Circuit considered the testimony of the law enforcement officer who questioned defendant Robinson, noting that the officer read the Miranda warnings to Robinson, and that Robinson indicated he understood and said that he would answer questions but would not sign the waiver form. The Fourth Circuit noted that Robinson did not indicate that he could not understand his rights. The Fourth Circuit also considered Robinson's prior contact with law enforcement and previous exposure to the Miranda warnings. Although Robinson later testified that he did not know what that language

---

[6] Following the *en banc* Sixth Circuit decision in Garner, Garner filed a petition for certiorari with the Supreme Court. Given the competing viewpoints and the possibility that the Supreme Court could choose to reach these issues in a manner that might benefit Petitioner, this Court withheld final determination in the present case as the Garner case proceeded. However, the Supreme Court has now denied certiorari in Garner, and the Sixth Circuit's *en banc* decision stands. See Garner v. Mitchell, 130 S. Ct. 125, 175 L. Ed. 2d 82 (2009).

of the <u>Miranda</u> warnings meant, and although he had a low IQ, the Fourth Circuit nevertheless

upheld the conclusion that the waiver was valid. <u>See</u> <u>Robinson</u>, 404 F.3d at 861. As part of that

determination, the Fourth Circuit noted that "below average I.Q. does not make [an individual]

per se incapable of intelligently waiving his rights," and the court cited with approval a case

finding that a waiver of rights was validly made by a "defendant with I.Q. of 62 and intellectual

capacity of an eleven year old." <u>See</u> <u>Robinson</u>, 404 F.3d at 861 (citing <u>Moore v. Dugger</u>, 856

F.2d 129, 134-35 (11th Cir. 1988) (holding that suspect with IQ of 62 and intellectual level of

eleven-year-old, who was classified as "educable mentally handicapped" in school, had

knowingly and intelligently waived <u>Miranda</u> rights, where the suspect appeared to understand

the questions and did not appear confused during the interview)); <u>see also</u> <u>Correll v. Thompson</u>,

63 F.3d 1279, 1288 (4th Cir. 1995) (holding that a suspect's <u>Miranda</u> waiver was knowing and

intelligent, even though the suspect had an IQ of only 68, based on the fact that the suspect was

24 years old, had had numerous experiences with law enforcement and <u>Miranda</u> warnings, was

"streetwise," and had been given the <u>Miranda</u> warnings more than once before the waiver).

Significantly, the Fourth Circuit in <u>Robinson</u> held as follows:

> In cases involving defendants with low intellectual ability, the knowingness of the waiver
> often turns on whether the defendant expressed an inability to understand the rights as
> they were recited. In <u>United States v. Rosario-Diaz</u>, 202 F.3d 54 (1st Cir. 2000), the First
> Circuit upheld the denial of a suppression motion involving a woman with an IQ in the
> 70s and no prior experience with the criminal justice system because the officers testified
> that the woman understood the questions and rights. <u>Id.</u> at 69. <u>See also</u> <u>United States
> v. Male Juvenile,</u> 121 F.3d 34, 40 (2d Cir. 1997) (finding waiver was knowing for juvenile
> with attentional and learning disabilities because juvenile indicated that he understood
> the rights as they were being read to him).

<u>Robinson</u>, 404 F.3d at 861. Therefore, in analyzing this claim, the Fourth Circuit focused on

36

whether the defendant expressed to the officers "an inability to understand the rights as they were recited," thus focusing on the officer' perspective.  <u>Robinson</u>, 404 F.3d at 861.  Because Robinson indicated to the officers that he understood his rights as they were being recited, the Fourth Circuit concluded that the waiver was valid.

However, the Fourth Circuit also noted that in that case, although Robinson had a low IQ and several mental disorders, "nothing in the record indicates that Robinson could not understand the rights as [the officer] provided them."  Thus, the Fourth Circuit also considered whether there was evidence in the record indicating that Robinson could not have understood the rights as the officer provided them, as a subjective inquiry focusing on the defendant himself rather than the perception of the officers.  <u>Robinson</u>, 404 F.3d at 861.  Thus, it is not clear whether the Fourth Circuit has adopted a test like that in the Sixth and Seventh Circuit, focusing on the reasonable perception of the officers, or instead has maintained a test that includes consideration of the defendant's subjective understanding.

Even in circuits that continue to maintain a test that includes consideration of the defendant's subjective understanding of his rights, rather than a test that focuses only on the reasonable perception of the officers, courts have still found that individuals who are mentally impaired nevertheless made knowing and intelligent waivers of their <u>Miranda</u> rights, despite later testing and expert testimony to the contrary.  For example, in <u>Smith v. Mullin</u>, 379 F.3d 919 (10th Cir. 2004), the Tenth Circuit considered a defendant who alleged that he could not intelligently waive his <u>Miranda</u> rights based on "mental retardation, mental illness, and the police detectives' 'intentional and calculated misrepresentations.'"  <u>Smith v. Mullin</u>, 379 F.3d at 933.

The Tenth Circuit noted that each doctor who examined the defendant placed him in the range of mild to borderline mental retardation.  Id.  In addition, a neuropsychologist testified that the defendant's comprehension was similar to a 12-year-old's, that the defendant suffered brain damage as a result of a near-drowning as a child, and that based on the results of the "Grisso[7] test," the defendant could not waive his Miranda rights.  Id.  However, the Tenth Circuit nevertheless concluded that in the totality of the circumstances, the defendant knowingly waived his Miranda rights.  Id.  The Tenth Circuit specifically noted that the defendant could "understand the role of police officers and the concept of a criminal charge."  Id.  The Tenth Circuit also discounted the Grisso testing and noted that having the cognitive abilities of a twelve-year-old would not render his waiver ineffective.  Id. at 933-34.  Significantly, the Tenth Circuit also focused on the fact that during the interrogation, the defendant "stated his understanding of the Miranda rights," understood the questions presented, provided an accurate description of the crime scene, and also had prior experience with the criminal justice system. Id. at 934; see also United States v. Burson, 531 F.3d 1254, 1260 (10th Cir. 2008) (focusing on whether the suspect acknowledged and waived his rights during the interrogation, and whether suspect's answers were "unrealistic or delusional" in determining whether Miranda waiver was knowing and intelligent).  In addition, the Sixth Circuit in Garner similarly concluded that even if the "police-focused" analysis were not applied, the evidence in the record in that case did not mandate the conclusion that Garner could not understand the Miranda warnings, despite the

_____

[7] Thomas Grisso, Instrument for Assessing Understanding & Appreciation of Miranda Rights (1998).

testing and expert opinion evidence to the contrary. See Garner, 557 F.3d at 263. In this regard, the *en banc* Sixth Circuit noted that with respect to the "Grisso" testing, the "subjective and legally questionable nature of the grading criteria. . . . bring into question its usefulness in determining whether an examinee could understand the Miranda warnings." Garner, 557 F.3d at 268-69; see also Murphy v. Ohio, 551 F.3d 485, 515-16 (6th Cir. 2009) (questioning reliability of Grisso testing and concluding that Miranda waiver was knowing and intelligent, despite Grisso test and expert testimony concluding that the defendant did not comprehend Miranda warnings or his right to remain silent).

In the present case, in considering Petitioner's contentions on state collateral review, the MAR court cited North Carolina state court cases holding that subnormal capacity was a factor to be considered in determining whether a waiver of rights was knowingly and intelligently made, but that lack of intelligence standing alone would not render an in-custody statement incompetent. See State v. Jones, 153 N.C. App. 358, 366-68, 570 S.E.2d 128, 135-36 (2002) (holding that a defendant with an IQ between 56 and 69 could intelligently waive his rights (citing State v. Fincher, 309 N.C. 1, 8, 305 S.E.2d 685, 690 (1983) (holding that defendant with IQ of 50 was capable of waiving rights)); State v. Jenkins, 300 N.C. 578, 583-86, 268 S.E.2d 458, 462-63 (1980) (finding intelligent waiver of rights by defendant with IQ of less than 60, despite expert testimony that the defendant did not understand the warnings and could not have made a knowing and intelligent waiver of his right to counsel, based on determination that officer went over rights with defendant during interview and defendant indicated he understood, and noting that "[a] defendant's subnormal mental capacity is a factor to be considered, but such lack of

39

intelligence, standing alone, does not render an in-custody statement incompetent if it is in all other respects voluntary and understandingly made"); State v. Thompson, 287 N.C. 303, 214 S.E.2d 742 (1975) (finding that a 19-year-old with an IQ of 55 and the intellectual functioning of a third through fifth grader had been advised of his Miranda rights and knowingly and intelligently waived his right to counsel). However, as noted above, the MAR court did not make any specific findings or analysis with respect to whether Petitioner's waiver of his rights was knowing and intelligent. Instead, the MAR court moved to a final, general conclusion that Petitioner's mental disabilities would not have supported a Fifth Amendment challenge because there was no evidence of police misconduct.

Following this determination by the MAR court, Petitioner brought his habeas petition in this Court. In his habeas petition, Petitioner contends that any waiver of his Miranda rights was not knowing and intelligent, and that the state MAR court's conclusion was contrary to or an unreasonable application of federal law because the MAR court did not separately consider whether the waiver was knowing and intelligent. In support of his contention that his waiver of Miranda rights was not knowingly and intelligently made, Petitioner points to the unrefuted determination by the state court that he was and is mentally retarded. Petitioner has also presented evidence to establish that he attended special classes through school due to his mental retardation, and he has presented the testimony and affidavits of friends and relatives regarding his mental limitations. Petitioner also presented affidavits from an expert witness, Dr. John Gregory Olley, to attempt to establish that he did not understand the Miranda waiver of rights form and that he believed the signing the waiver of Miranda rights form was a request for an

40

attorney. As noted above, in light of these contentions and the issues raised, this Court conducted an evidentiary hearing on these issues. At the evidentiary hearing before this Court, Petitioner presented the testimony of Dr. Olley, who testified that Petitioner was mildly mentally retarded, with an IQ of 69 and the mental age of an 8-year-old. Dr. Olley testified that the Miranda rights form signed by Petitioner was written at an eighth-grade reading level, while Petitioner could only read and understand at a second-grade reading level. Dr. Olley testified that as a result of Petitioner's retardation, and based on various testing, including "Grisso" testing, conducted by Dr. Olley several years after the actual waiver of Petitioner's Miranda rights, "it would be extraordinarily unlikely" that Petitioner understood the Miranda waiver form. Dr. Olley testified that in his opinion Petitioner did not have the ability to read and understand the Miranda waiver form and did not understand his Miranda rights. Furthermore, Dr. Olley presented his opinion to the Court with respect to the ultimate conclusion on the second prong, specifically, that in his opinion Petitioner did not knowingly and intelligently waive his Miranda rights. Notably, the expert witness proffered by the State, Dr. Mark Hazelrigg, also testified that based on his use of the Grisso testing and his review of Dr. Olley's previous testing, Petitioner did not demonstrate an understanding of his Miranda rights or of the waiver of rights form used in this case, at least at the time of the testing which was significantly later than the actual questioning by Detective Saul. Dr. Hazelrigg did indicate, though, that it was possible Petitioner had a higher degree of understanding than he was then demonstrating.

However, even if the Court were compelled to accept the expert's determinations in this

regard, the Court notes that, as discussed above, the Sixth and Seventh Circuits have adopted a "police-focused" test for determining whether a suspect has knowingly and intelligently waived his Miranda rights, focusing on whether the officers knew or should have known that the suspect could not understand or intelligently waive his rights.[8] If this test is employed in the present case, it is clear that a Miranda challenge could not have been made successfully, as the evidence before the Court in the record and at the evidentiary hearing establishes that officers had no reason to know of Petitioner's mental impairments and had no reason to question Petitioner's ability to understand and waive his Miranda rights at the time of the interview. In this regard, at the hearing before this Court, Dr. Olley agreed that someone talking to Petitioner may not know he is mentally retarded, and Dr. Hazelrigg also testified that a layperson would not necessarily be able to perceive that Petitioner was mentally retarded. Petitioner presented no evidence that would establish that officers had any reason to know that Petitioner had any mental impairments. In his testimony before this Court, Detective Saul stated that he did not have any difficulty understanding or carrying on a conversation with Petitioner, and that Petitioner appeared to comprehend the questions and give appropriate responses. Detective

---

[8] As discussed previously, the Fourth Circuit has not clearly adopted such a "police-focused" test, and the Fourth Circuit cases consider both the officer's perception and a subjective inquiry focusing on the defendant himself rather than the perception of the officers. However, on habeas review, this Court must consider whether the determination of the state MAR court was contrary to or an unreasonable application "*clearly established* Federal law, as determined *by the Supreme Court of the United States.*" 28 U.S.C. § 2254(d). In considering what is "clearly established Federal law, as determined by the Supreme Court of the United States," the Supreme Court has considered the wide divergence of treatment among the lower federal courts on an issue as "[r]eflecting the lack of guidance" from the Supreme Court. See, e.g., Carey v. Musladin, 549 U.S. at 76-77, 127 S. Ct. at 654; see also Wright v. Van Patten, 552 U.S. at 126, 128 S. Ct. at 747.

42

Saul further testified before this Court that he did not have any question that Petitioner understood what he, Detective Saul, was explaining. Based on the evidence presented, the Court finds that Petitioner indicated to Detective Saul that he understood his rights, and Detective Saul had no reason to think otherwise.[9] Based on these findings, the Court concludes that under the "police-focused" test adopted in at least the Sixth and Seventh Circuits, there can be no question that Petitioner validly waived his Miranda rights, since there is no evidence, or even contention, that officers knew or should have known of Petitioner's mental impairments. Thus, if a "police-focused" test is used, Petitioner could not establish his claim for ineffective assistance of counsel, because even if trial counsel had fully investigated and presented the Miranda claim, the Miranda claim would not have succeeded.

Petitioner nevertheless contends that the MAR court failed to follow clearly established federal law when it rejected his Miranda claims without considering whether Petitioner actually understood his Miranda rights and knowingly and intelligently waived those rights. However, in light of the various tests employed by the various circuits, including the "police-focused" test

---

[9] The evidence before the state trial court also supports this conclusion. At the hearing before the state trial court, Detective Saul testified that Petitioner did not appear to be under the influence of any intoxicant, that Petitioner was able to communicate in a coherent manner, that Petitioner indicated he could read, and that there was no question in Detective Saul's mind regarding Petitioner's mental capabilities. During the state court trial, Detective Saul testified that he asked Petitioner if he understood, could hear, and was not under the influence of any impairing substance. Detective Saul testified that he read each statement on the Acknowledgment of Rights form, and asked Petitioner whether he understood after each statement, and Petitioner acknowledged yes, that he understood. The trial court originally considering Petitioner's Motion to Suppress noted that Petitioner was coherent, did not appear to be under the influence of any substance, and advised Detective Saul that he could read. (See Order of June 8, 1999 at Finding of Fact 30).

in the Sixth and Seventh Circuits which focuses exclusively on the circumstances of the waiver from the viewpoint of the officers, this Court concludes that a test focusing on Petitioner's subjective understanding of his rights is not mandated by *clearly established* federal law. Therefore, the conclusion reached by the MAR court, rejecting Petitioner's claim for ineffective assistance of counsel because Petitioner's "mental disabilities would not have supported a Fifth Amendment challenge to [his] confession," is not contrary to or an unreasonable application of *clearly established* federal law, since there is no question that Petitioner's Fifth Amendment challenge would not have succeeded if the "police-focused" test of the Sixth and Seventh Circuits is used.

Moreover, even if a "subjective" test is employed, taking into account Petitioner's subjective understanding of his rights and the waiver of those rights, Petitioner still has not shown that the conclusion of the MAR court was unreasonable or contrary to federal law. In this regard, the Court first concludes, like other courts that have considered the matter, that the "Grisso" test relied on by the experts requires a higher degree of understanding than that required by the courts. See, e.g., Murphy v. Ohio, 551 F.3d at 515-16; Smith v. Mullin, 379 F.3d at 933-34. Therefore, the Court is not compelled to accept the conclusions of the expert witnesses. Instead, the Court must consider the "totality of the circumstances," including consideration of Petitioner's interactions with law enforcement officers during the course of the interview. At the evidentiary hearing before this Court, Detective Saul testified that when Petitioner arrived at the station, Detective Saul requested Petitioner's shoes for examination, but Petitioner refused, and did not turn over his shoes until Detective Saul obtained a warrant for

the shoes. At the state trial, Petitioner testified that he didn't give Detective Saul his shoes because he "didn't want to." Petitioner thus asserted his rights as he chose. Furthermore, before questioning Petitioner, Detective Saul reviewed the Miranda rights form with Petitioner. As Detective Saul read each provision, he asked Petitioner if he understood and checked off each provision after Petitioner verbally indicated that he understood. Petitioner subsequently signed the Acknowledgment of Rights and agreed to talk with Detective Saul, but it is significant as to whether he acted knowingly and intelligently that during their first interaction, Petitioner refused to sign the Waiver of Rights and denied any involvement in the offense. The Court also takes into account that later, after he was arrested, Petitioner, without prompting, asked another officer for an opportunity to speak further with Detective Saul. Thus, Petitioner himself initiated further interaction with Detective Saul. During this second encounter, Detective Saul read Petitioner his Miranda rights for a second time, again confirming that Petitioner understood his rights and checking off each provision after Petitioner verbally indicted that he understood. During this second interview, Petitioner signed the Acknowledgment of Rights and also signed a written Waiver of Rights, which provided that "I have read the above statement of my rights and also had my rights explained to me by a police officer. Knowing these rights, I do not want a lawyer at this time. I waive these rights knowingly and willingly and agree to answer questions and/or make a statement." Petitioner began his second interview with Detective Saul by stating, without any solicitation, that "[s]ome people need to be in prison." Petitioner then made an incriminating statement to Detective Saul detailing the offense. At the time of this encounter, Petitioner had also experienced prior interactions with law enforcement, including a prior state

45

court conviction in 1990 for armed robbery, second degree kidnapping, and assault on a police officer with a firearm, and a prior state court conviction in 1986 for common law robbery. Thus, Petitioner had been arrested twice before, had at least some familiarity with police procedures, and had entered guilty pleas in state court. At the time of the interview with Detective Saul, Petitioner was coherent, gave appropriate responses, appeared to understand, indicated an ability to read and understand his rights, affirmatively asserted his rights in at least some respects, chose to initiate the subsequent interview with Detective Saul, was read his Miranda rights two times, signed a written waiver of his rights, and began his second interview with Detective Saul by stating that "[s]ome people need to be in prison."

Although Petitioner had an IQ of 69, that IQ is higher than that of other defendants in the cases cited at length above who have been found to have intelligently and knowingly waived their Miranda rights. In this regard, the Court has accepted and considered the determinations by the state court regarding Petitioner's mental retardation, and the Court has also considered the additional expert testimony presented by Petitioner. However, the Court notes that as part of the testing performed by Dr. Olley in this case, Petitioner was asked to explain the phrase "You do not have to make a statement and you have the right to remain silent" and Petitioner stated that this meant "You don't have to talk. That's what it means." With respect to the phrase "you are entitled to consult with an attorney before interrogation and to have an attorney present at the time of interrogation," Petitioner responded that this "means you need a lawyer" and when asked "when?", Petitioner responded "anytime." Dr. Olley also asked Petitioner the meaning of the statement "I want to consult with him." Petitioner answered "take counsel," and

46

then further answered "call me to talk to me, talk to me and ask questions." In addition, when asked by Dr. Hazelrigg to explain the phrase "Anything you say can and will be used against you in a court of law," Petitioner stated that this meant "If you spit [talk], your ass is fried." While colloquial, these answers indicate a basic understanding of the right to remain silent. See Colorado v. Spring, 479 U.S. at 574 (noting that "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege," and Miranda warnings are designed to ensure only that "a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time"). As noted above, although the experts concluded that Petitioner did not demonstrate an understanding of his Miranda rights based on their testing, the Court is not compelled to accept their conclusion. Cf. Smith v. Mullin, 379 F.3d at 934 (discounting Grisso testing and focusing on the fact that during the interrogation, the defendant "stated his understanding of the Miranda rights," understood the questions presented, provided an accurate description of the crime scene, and also had prior experience with the criminal justice system); Murphy v. Ohio, 551 F.3d at 515-16 (questioning reliability of Grisso testing and concluding that Miranda waiver was knowing and intelligent, despite Grisso test and expert testimony concluding that the defendant did not comprehend Miranda warnings or his right to remain silent). In the totality of the circumstances, and considering all of the evidence presented, the Court concludes that it is not contrary to or an unreasonable application of clearly established federal law to conclude that Petitioner knowingly and intelligently waived his Miranda rights.

47

Therefore, having considered Petitioner's contentions, this Court concludes that the result reached by the MAR court was not contrary to or an unreasonable application of federal law. Although the decision of the MAR court in this case did not include specific discussion or analysis of whether Petitioner knowingly and intelligently waived his rights, this Court considers the result reached by the MAR court, not the reasoning, and the result reached by the MAR court was that Petitioner validly waived his <u>Miranda</u> rights and that his mental disabilities would not have successfully supported a Fifth Amendment challenge. <u>See</u> <u>Larry v. Branker</u>, 552 F.3d at 365 ("[W]hen assessing the reasonableness of the state court's application of federal law, the federal courts are to review the result that the state court reached, not whether its decision was well reasoned." (internal quotations and alterations omitted)); <u>see also</u> <u>Bell v. Jarvis</u>, 236 F.3d at 163 (noting that where a state court fails to articulate the rationale behind its ruling, federal habeas review is still deferential "because we cannot grant relief unless the state court's *result* is legally or factually unreasonable" (emphasis in original)). Therefore, this Court cannot find that the ultimate determination reached by the MAR court is contrary to or an unreasonable application of clearly established federal law.

Moreover, even if deferential review did not apply given the MAR court's failure to make specific findings on this issue, this Court further concludes that even under *de novo* review, Petitioner's habeas claim must be denied. In this regard, the Court concludes that there is no reasonable probability that a motion to suppress on <u>Miranda</u> grounds would have been successful, even if Petitioner's trial counsel had assembled and presented all of the evidence that has now been presented. In reaching this conclusion, the Court finds, based on the evidence

48

presented and discussed at length above, that even if a "subjective" test is employed, taking into account Petitioner's subjective understanding of his rights and the waiver of those rights, Petitioner knowingly and intelligently waived his <u>Miranda</u> rights, based on a consideration of the "totality of the circumstances" as set out above. Therefore, Petitioner was not prejudiced by his trial counsel's failure to move to suppress his confession on <u>Miranda</u> grounds or by his trial counsel's alleged failure to develop further evidence before the trial court to support such a motion. The Court therefore concludes that Petitioner cannot establish a claim for ineffective assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).[10]

Finally, to the extent that Petitioner attempts to bring a separate claim in Claim 4 alleging that the admission of his confession violated the Fifth Amendment, asserted as a direct claim rather than a claim for ineffective assistance of counsel, that claim was not raised on direct appeal or before the MAR court. Moreover, even if that claim could properly be raised before this Court, that claim also fails. Specifically, based on the findings set out above, the Court concludes that Petitioner has failed to establish that he did not voluntarily, knowingly and understandingly waive his <u>Miranda</u> rights. Petitioner's claims as set out in Claims 1 and 4 of his Petition will therefore be denied.

      B.      Alleged Ineffective Assistance of Counsel for Failing to Investigate and Present Evidence that Confession was "False" or "Not Credible"

---

[10] Having reached this determination, the Court need not consider whether Petitioner can establish deficient performance by trial counsel in failing to investigate and pursue this claim, since Petitioner cannot show he was prejudiced by the alleged deficient performance.

Petitioner also contends that he received ineffective assistance of counsel because his trial counsel should have investigated and presented evidence to the jury to demonstrate that his confession was "false" or "not credible." Petitioner specifically points to psychological evidence and testimony that Petitioner has now obtained, but that trial counsel failed to obtain, to show that he is susceptible to suggestion and that the confession was written at a reading level beyond what Petitioner could comprehend. In particular, Petitioner contends that the confession was written in language that is the equivalent of fifth-grade level, while Petitioner reads only at a second-grade level or the level of an 8-year old. Petitioner further contends that the confession is written in language that is not language the Petitioner normally uses.

Petitioner raised this contention with the MAR court, contending that trial counsel should have presented evidence to establish that he was susceptible to suggestion, prone to make a false confession, and unable to read or understand the confession. Petitioner contends that the additional psychological evidence would have provided evidentiary support at trial that he was susceptible to suggestion and that due to this suggestibility, he agreed to sign the statement written by Detective Saul without reading or understanding the contents of the statement. Petitioner also contends that the additional psychological evidence that trial counsel failed to obtain would have supported the contention that Petitioner was prone to make a statement that was not accurate.

With respect to these contentions, the state MAR court found that Petitioner's counsel had raised at trial the theory that "defendant's confession could have been affected by his mental problems including suggestibility and that it was therefore not credible." The MAR court noted

50

that because this claim was a "repetition of the theory advanced at trial" it could have been raised on direct appeal and was subject to the procedural bar of N.C. General Statute § 15A-1419(a)(3). The MAR court alternatively found on the merits that, to the extent Petitioner claimed that trial counsel was ineffective for failing to obtain sufficient evidence in support of this theory, Petitioner had failed to demonstrate that trial counsel was ineffective under the Strickland standard, particularly in light of the fact that Petitioner did have the assistance of a psychologist at trial and did in fact present this theory to the jury at trial. The MAR court noted that it must, under Strickland, indulge a strong presumption that counsel's conduct fell within the wide range of professional assistance, and that Petitioner could not establish ineffective assistance as to this claim.

This Court has considered Petitioner's claim and concludes first that this claim is subject to a procedural bar to the extent that the state MAR court denied this claim based on an "independent and adequate state ground." "[F]ederal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.' . . . . [W]hen a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review." Cone v. Bell, 129 S. Ct. 1769, 1780, 173 L. Ed. 2d 701 (2009) (quoting Coleman v. Thompson, 501 U.S. 722, 729, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991)). If the state court denies relief based on such an independent and adequate state ground, habeas review is barred unless the petitioner can demonstrate "cause for the default and

51

actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. at 750, 111 S. Ct. at 2565. Petitioner has failed to make such a showing, and the procedural bar therefore applies as to this claim.

In addition, to the extent that the MAR court considered this claim on the merits and concluded that Petitioner had failed to meet the Strickland standard, this Court finds that this conclusion was not contrary to or an unreasonable application of clearly established federal law. In particular, this Court agrees with the MAR court that trial counsel did obtain at least some psychological testing of Petitioner, and did present to the jury the theory that Petitioner had mental impairments and that the confession was therefore not credible or reliable. In his opening and closing statements, trial counsel noted that Petitioner's confession contained numerous potential inconsistencies compared with the evidence that had been developed, thus casting doubt on whether the statement was true. During trial, trial counsel presented Dr. Coleman as an expert to set out at least some evidence of Petitioner's mental impairments, including that Petitioner was borderline mentally retarded, had undifferentiated schizophrenia, and read at a second grade level. Trial counsel also presented Petitioner's testimony on his own behalf, in which Petitioner stated that Detective Saul told him what happened during the crimes, and that Petitioner had just agreed with whatever Detective Saul said or wrote in the statement without reading or understanding it, because he got "mad" and "didn't care." During closing argument, trial counsel noted that according to Dr. Coleman, Petitioner's verbal IQ was 63, which was in the range of retardation, and this verbal score was not affected by his medication.

52

Trial counsel further argued that according to Dr. Coleman, Petitioner "reads at a second grade level," and that jurors should read the confession closely to "see if those words are the same kind of words a second grader would use in telling somebody about what happened." Trial counsel also suggested that Detective Saul must have given Petitioner details about the crime, and that it did not make sense that Petitioner spontaneously provided the details himself, and instead Petitioner just agreed with what Detective Saul had said. During trial counsel's closing argument, the trial court sustained an objection by the State and did not allow trial counsel to argue that Petitioner was more likely to "make up" stories due to his mental impairment. Nevertheless, trial counsel was allowed to rephrase his closing argument to the jury to argue that "common sense" tells you that someone of limited mental capacity could say things that are not true, that Petitioner's mental limitations and disease affected the believability of the statement, that sometimes people make false statements, and that it was "believable" that Petitioner gave in to the pressure by Detective Saul and just agreed with whatever Detective Saul said, particularly in light of Petitioner's "condition" and the evaluation done by Dr. Coleman. Thus, it is evident that trial counsel did present evidence and argument regarding Petitioner's mental impairments in relation to the believability of the statement, although trial counsel did not present the same quantum of evidence that has now been established in these habeas proceedings regarding Petitioner's mental impairments. In these circumstances, this Court cannot conclude that the determination of the MAR court was contrary to or an unreasonable application of federal law.

Moreover, this Court has fully considered the additional psychological evidence now

offered by Petitioner, and this Court concludes that even under *de novo* review, Petitioner cannot establish a habeas claim for ineffective assistance of counsel for failing to obtain and present this evidence at trial, since the additional evidence would not have created a reasonable probability of a different result at trial, and therefore Petitioner cannot establish that he was prejudiced by this alleged failure. As part of the evidentiary hearing conducted before this Court, Petitioner presented the testimony of Dr. Olley, who testified that someone who is mentally retarded is more inclined to agree with or give in when an authority figure pressures them to do something, and that in his opinion, Petitioner has a high level of suggestibility and would be likely to sign something that he did not understand. Dr. Olley further testified that the confession is written at a fifth-grade reading level while Petitioner reads at a second-grade reading level, and that in Dr. Olley's opinion Petitioner did not understand the contents of the confession that he signed. Petitioner contends that trial counsel was ineffective in failing to obtain and present this evidence at trial. However, the State's expert, Dr. Hazelrigg, testified at the evidentiary hearing before this Court that in his opinion, Petitioner was not suggestible and instead was "strong-minded," "forceful and determined in getting his perspective across," and not easily led. Dr. Hazelrigg also testified that Petitioner's testimony at trial further supported the conclusion that Petitioner was not easily led. Finally, Dr. Hazelrigg also testified that the confession, although probably not Petitioner's verbatim words, was consistent with being a "translation of his informal language" in that whatever slang terminology and informal expressions Petitioner used were modified to be more sensible. Between these conflicting views of Dr. Olley and Dr. Hazelrigg, the Court finds that Dr. Hazelrigg's view is more consistent with the evidence that

54

has been presented. Therefore, even if this additional evidence had been presented at trial, there is no reasonable probability that the jury would have reached a different result.

Moreover, the Court notes that Petitioner's allegation that the confession was "false" or "not credible" is premised on the contention that Detective Saul wrote the confession for Petitioner, or at the very least provided the details to Petitioner and suggested to Petitioner what to say. However, the jury in Petitioner's case rejected this contention, and credited the testimony of Detective Saul, who testified at trial that he did not provide Petitioner with any of the details regarding Ms. McCracken's murder or any information at all regarding the burglary at the neighbor, Mr. Crompton's, apartment. The Court heard from Detective Saul during the evidentiary hearing before this Court with respect to the events surrounding the confession, and this Court likewise credits the testimony of Detective Saul. According to Detective Saul, Petitioner denied any involvement in the crime until after he was arrested. After Petitioner was arrested, Petitioner, without provocation, asked to speak to Detective Saul, and as noted above, spontaneously told Detective Saul that "[s]ome people need to be in prison." Detective Saul listened while Petitioner told the story of how he broke into the apartment and killed Ms. McCracken. Detective Saul then told Petitioner to go over what happened again and Detective Saul would write it down. Detective Saul testified that he wrote the confession down based on his understanding of what Petitioner said, but not word-for-word and not using Petitioner's "slang." This paraphrasing by Detective Saul explains the difference between the language used in the confession and the language otherwise used by Petitioner. Detective Saul read the statement back to Petitioner, with Petitioner sitting beside him, and Petitioner signed each page

55

to indicate he agreed with the statement. Detective Saul testified that he wrote the statement as accurately as he could based on what Petitioner said, and that he would not have known all the facts set out in the confession unless Petitioner had given them to him. Detective Saul further testified that it was his impression that Petitioner understood the statement as they reviewed it together. In addition, the state court trial transcript indicates that after they reviewed the statement together, Petitioner added the final paragraph to the effect that he was sorry and hoped Ms. McCracken's family would forgive him. Petitioner did not testify at the evidentiary hearing before this Court, and the Court finds the testimony of Detective Saul to be credible regarding the circumstances of the confession. As such, there is no reasonable probability that the jury would have rejected Detective Saul's version of events, even if Dr. Olley's testimony had been presented at trial.

Thus, having considered all of this additional evidence, the Court finds that even if trial counsel had fully developed and presented the additional psychological evidence at Petitioner's trial, there is no reasonable probability that with the additional psychiatric or psychological evidence, the jury would have reached a different result. Thus, Petitioner cannot establish any prejudice in trial counsel failing to further investigate and present this psychological evidence, and Petitioner therefore cannot establish a claim for ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). Petitioner's habeas claim on this basis will be denied.

C.     Alleged Ineffective Assistance of Counsel for Failing to Create a Defense Plan for the Trial on the Merits

Petitioner next contends that he received ineffective assistance of counsel in violation of

56

his Sixth Amendment rights because his trial counsel did not prepare a defense strategy or otherwise sufficiently prepare for trial. Petitioner contends that trial counsel failed to obtain a thorough mental examination of Petitioner, waited until too late to contact the mitigation specialist, and failed to spend sufficient time preparing for trial. The MAR court considered this claim and found that Petitioner had failed to show what additional work by his defense counsel would have benefited Petitioner at trial. The MAR court found that Petitioner did not identify specific acts or omissions by trial counsel that were alleged to be deficient as required by Strickland. The MAR court further found that Petitioner's trial counsel did have a defense strategy which included showing that his confession was questionable because of his multiple mental problems and that in any event he was too big an individual to fit through the window of Ms. McCracken's apartment. The MAR court concluded that Petitioner had not shown any prejudice from any alleged insufficient work by trial counsel, and that Petitioner had failed to make even a prima facie claim of ineffective assistance of counsel.

Having reviewed Petitioner's contentions before this Court, this Court cannot find that the factual findings by the MAR court are unreasonable, or that the conclusion of the MAR court was contrary to or an unreasonable application of federal law. The MAR court found that there was a discernable trial strategy, and that finding is supported by the record in this case. In addition, the only specific failures alleged by Petitioner relate to his contention that trial counsel failed to present sufficient psychological evidence to establish that he did not knowingly and intelligently waive his Miranda rights and that his confession was not believable. These contentions are discussed in detail above. Petitioner has not pointed to any other specific failure

57

by trial counsel, nor has Petitioner shown any action by trial counsel that would have led to a reasonable probability of a different result before or during trial. The Court notes that Petitioner now raises complaints regarding trial counsel's failure to timely obtain a "mitigation specialist" or conduct more intense psychological testing, as well as trial counsel's failure to devote a greater number of hours to preparing for trial. However, in evaluating these claims, the Court notes that Petitioner is not facing the death penalty now, and therefore this Court does not need to analyze the effectiveness of counsel at the sentencing phase. Instead, the Court has considered the time, effort, strategy and level of assistance provided by defense counsel with respect to the guilt-innocence phase of trial. In this context, the state court's conclusion that Petitioner's ineffective assistance of counsel claim was without merit is not contrary to or an unreasonable application of clearly established federal law.

Moreover, this Court further concludes that even if this claim were considered *de novo*, and even if Petitioner could establish that trial counsel failed to perform adequately in some regard, Petitioner has not presented any basis to find that there is a reasonable probability that the jury would have reached a different result but for counsel's failure. In this regard, Petitioner has not shown how a more thorough mental examination, more time for the mitigation specialist, or more time by counsel spent preparing for trial would have led to a different result. Therefore, the Court concludes that Petitioner cannot establish that he was prejudiced by any alleged failure by his trial counsel. As such, Petitioner cannot establish that he is entitled to habeas relief under Strickland. Therefore, Petitioner's habeas claim on this basis will be denied.

IV.    CONCLUSION

58

Having considered all of the claims raised by Petitioner in his Petition, the Court concludes that the decisions by the state MAR court were not contrary to or an unreasonable application of federal law. In addition, the Court further concludes that with respect to Petitioner's claims for ineffective assistance of counsel, Petitioner has not shown that there is a reasonable probability of a different result, even if trial counsel had fully developed and presented all of the evidence that has now been presented. Therefore, Petitioner did not suffer any prejudice as a result of any alleged ineffective assistance of counsel. The Petition for Habeas Corpus will therefore be DENIED and this case will be DISMISSED.

However, the Court further finds that this case raises significant legal questions, particularly with regard to the evaluation of Petitioner's contention that he did not knowingly and intelligently waive his <u>Miranda</u> rights. Given the issues raised, the Court finds that Petitioner has made a sufficiently substantial showing to warrant granting a certificate of appealability. <u>See</u> Federal Rules Governing § 2254 Cases, Rule 11 (noting that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant"); 28 U.S.C. § 2253 (noting that a certificate of appealability may issue only if the applicant has made "a substantial showing of the denial of a constitutional right"); <u>Rose v. Lee</u>, 252 F.3d 676, 683 (4th Cir. 2001) ("To make the required showing, a petitioner must demonstrate that 'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000)). Therefore, this Court will GRANT a Certificate

59

of Appealability in this case, specifically as to Petitioner's claim that he did not knowingly and intelligently waive his Miranda rights and that his trial counsel was ineffective in failing to raise this issue in state court.

IT IS THEREFORE ORDERED that the Petition for Habeas Corpus [Doc. #1] is DENIED and this case is hereby DISMISSED.

IT IS FURTHER ORDERED, HOWEVER, that a Certificate of Appealability is GRANTED as to Petitioner's claim that he did not knowingly and intelligently waive his Miranda rights and that his trial counsel was ineffective in failing to raise this issue in state court.

A Judgment will be entered contemporaneously herewith.

This, the 9th day of July, 2010.

United States District Judge